AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
**9/8/25**
CENTRAL DISTRICT OF CALIFORNIA
BY: ___MPV___ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California



FILED
CLERK, U.S. DISTRICT COURT
**09/08/2025**
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CLD___ DEPUTY

United States of America

v.

JOHNATHAN MICHAEL ALFARO,

Defendant.

Case No.   2:25-mj-05546-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, Frank Pelligrini, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of September 1, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 111 | Assault on a Federal Officer |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_/s/_
_Complainant's signature_

Frank Pelligrini, Special Agent
_Printed name and title_

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   September 8, 2025

_Judge's signature_

City and state:   Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge
_Printed name and title_

AUSA:___Neil Thakor x 6595

## <u>AFFIDAVIT</u>

I, Frank Pellegrini, being duly sworn, declare and state as follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaint against, and arrest warrant for, Johnathan Michael Alfaro ("ALFARO") for a violation of 18 U.S.C. § 111: Assault on Federal Officer.

2.   This affidavit is also made in support of warrants to search:

a.   The person of JOHNATHAN MICHAEL ALFARO ("ALFARO"), and any digital devices as described in attachment A-1;

b.   A 2024 Subaru Outback bearing California license plate 9MCP667 (the "SUBJECT VEHICLE"), as described more fully in Attachment A-2; and

c.   The premises located at 1206 S Gladys Avenue, in San Gabriel, California (the "SUBJECT PREMISES") as described more fully in Attachment A-3.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 111: Assault on a Federal Officer, and 18 U.S.C. § 372: Conspiracy to Obstruct or Injure a Federal Officer (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, A-3 and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested criminal
complaint, arrest warrant, and search warrants and does not
purport to set forth all my knowledge of or investigation into
this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only, and all dates and times
are on or about those indicated.

## II. BACKGROUND OF AFFIANT

5.    I am a Criminal Investigator and Special Agent with
the Federal Protective Service ("FPS"). I have been employed as
a full-time, sworn federal Special Agent with FPS since
September of 2017. I am currently assigned to the Sacramento
area of responsibly and investigate violations of federal law in
the Eastern District of California. I am a sworn federal law
enforcement officer and have authority to investigate federal
offenses pursuant to Title 18 of the United States Code. I am
certified to work as a Criminal Investigator with FPS after
completing the Federal Law Enforcement Training Center's
Criminal Investigator Training Program at Glynco, Georgia.

6.    Prior to my time as a criminal investigator, I was a
uniformed police officer with FPS dating back to February of
2009. During that time, I was also employed as a K9 officer from
2011 to 2017. I was certified to work as an Inspector with FPS

after completing FLETC's Uniformed Police Training Program in Glynco, Georgia. I was certified to work as a K9 Handler with FPS after completing Auburn University's Canine Explosives Detection Training Course in Auburn, Alabama.

7.    During my employment with FPS, I have performed law enforcement duties with the Federal Government, enforcing United States Code, Code of Federal Regulation, California Penal Code and California Vehicle Code as an official under Title 40 United States Code, Section 1315 along with California Penal Code Section 830.5 and 832. I am experienced writing and submitting criminal complaints and affidavits in pursuit of search and arrest warrants at both the Federal and State level. I am experienced in the collection and processing of evidence. I have years' experience interviewing; suspects, subjects, complainants, victims, and witnesses to gather relevant case information. I have served search warrants, arrest warrants, and bench warrants for crimes on both State and Federal violations. I continually work with federal agencies, state departments, and civilian sources to make multi-jurisdictional arrests.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

8.    Based on my review of surveillance camera footage captured by a camera positioned near the Alameda Street entrance to the Roybal Federal Building in Los Angeles ("Roybal"), I know the following:

        a.    On September 1, 2025, at approximately 12:40 a.m., a car that was later identified as the SUBJECT VEHICLE

parked on Alameda Street across from the parking garage entrance
to Roybal.

    b.    After the SUBJECT VEHICLE parked, a man (later
identified as ALFARO) exited the car, walked across Alameda
Street, and approached the fence that stands between the
sidewalk that abuts Alameda Street and the apron leading to the
Roybal parking garage (the "Fence").[1]

    c.    After ALFARO reached the FENCE, he loitered there
while wearing a distinct leather jacket and a gas mask on his
face.

    9.    Then, at approximately 1:23 a.m., a group of
individuals broke open the gate that is part of the Fence.  As a
result, at approximately 1:41 a.m., a team of FPS Inspectors
lead by FPS Area Commander C.M. emerged from Roybal and outside
the Fence to detain an individual that was involved in damaging
the gate.  As soon as FPS personnel began moving from Roybal
toward Alameda Street, surveillance video captured ALFARO
running to the SUBJECT VEHICLE and entering the driver's seat.
ALFARO then drove the SUBJECT VEHICLE from where it was parked

---

[1] The Fence was erected to surround the apron that leads to
the Alameda Street entrance to the Roybal parking garage and
contains a gate that can open and close to allow vehicle traffic
to pass through.

into the middle of the of Alameda Street.  By so doing, ALFARO angled the front of the SUBJECT VEHICLE in the direction of the FPS personnel who had exited from inside the Fence:



10.  Approximately four minutes later, several FPS Inspectors ran onto Alameda Street to attempt to arrest one of the individuals who they suspected damaged the Fence's gate. Based on my review of surveillance footage, it appears that as soon as FPS Inspectors entered onto Alameda Street, ALFARO accelerated the SUBJECT VEHICLE forward toward the FPS Inspectors and stopped abruptly in front of Area Commander C.M. Then, ALFARO accelerated the SUBJECT VEHICLE a second time toward Area Commander C.M.  The SUBJECT VEHICLE came close enough to Area Commander C.M. that he was able to touch the car with his hand.  The forward travel of the SUBJECT VEHICLE

appeared to knock Area Commander C.M. off balance and cause him
to stumble backward.

11. Then ALFARO drove the SUBJECT VEHICLE forward and
turned left before stopping perpendicularly in Alameda Street's
northbound lanes. FPS Inspectors gave ALFARO orders to stop and
attempted to open both the driver and passenger side doors. When
ALFARO continued, FPS deployed less lethal rounds at the SUBJECT
VEHICLE's passenger window. ALFARO accelerated the SUBJECT
VEHICLE, completed a U-Turn, and fled traveling north along
Alameda Street.

12. A few minutes later, surveillance video showed ALFARO
returning to the area and stopping the SUBJECT VEHICLE in the
southbound lanes of Alameda Street. FPS Inspectors deployed into
the street a second time to detain ALFARO. ALFARO again
accelerated the SUBJECT VEHICLE toward the FPS Inspectors but
abruptly stopped before making contact. ALFARO then fled the
scene in the SUBJECT VEHICLE.

13. Based on a review of the California Department of
Motor Vehicle's ("DMV") databases, I determined that the SUBJECT
VEHICLE was registered and owned by ALFARO. In addition, the DMV
photo for ALFARO matched surveillance video of ALFARO at the
incident. The home address associated with ALFARO on DMV records
is the SUBJECT PREMISES.

14. I interviewed several FPS personnel who have been
stationed at the Alameda Street parking garage to Roybal in the
past several weeks and have encountered the groups of
individuals who regularly congregate there to protest federal

immigration enforcement efforts.  Those FPS personnel recognized
ALFARO as attending previous protests outside Roybal, including
on August 30, 2025.  During these other incidents, law
enforcement observed ALFARO wearing the same distinct leather
jacket and gas mask he wore on September 1.

15.  When I interviewed Area Commander C.M., he stated he
recognized ALFARO from previous protests outside Roybal. After
the incident, C.M. also identified ALFARO in a six-person photo
line-up as the driver of the SUBJECT VEHICLE when the SUBJECT
VEHICLE nearly hit him on September 1.

16.  On or about September 3, 2025, I reviewed data
captured from license plate readers that captured the license
plate of the SUBJECT VEHICLE.  The data I reviewed showed that
the SUBJECT VEHICLE was found to be parked in the driveway of
the SUBJECT PREMISES on June 30, 2025, July 22, 2025, and August
1, 2025.

17.  On September 4, 2025, between approximately 10:40 a.m.
and 11:50 a.m., I conducted surveillance at the SUBJECT PREMISES
alongside a fellow FPS agent.  During that surveillance, we saw
the SUBJECT VEHICLE parked in the driveway facing the residence.

18.  I reviewed Google Earth photos of the SUBJECT
PREMISES which showed the SUBJECT PREMISES containing a detached
garage. The Google Earth photos I reviewed also showed
construction of a structure appended to the back of the detached
garage.

19.  I reviewed the Instagram associated with ALFARO which
identified an individual, J.T., as ALFARO's fiancé. Based on

searches of law enforcement databases, I identified J.T.
driver's license number, which I then searched through DMV
databases. Based on my review of DMV databases, the address
listed for J.T. was "Unit B" of the SUBJECT PREMISES.

IV. <u>**TRAINING AND EXPERIENCE ON ORGANIZED PROTEST GROUPS**</u>

20.  Based on my training and experience, as well as my
familiarity with investigations conducted by other law
enforcement agents into groups who organize in an effort to
obstruct federal law enforcement in the execution of their
duties, I know the following:

21.  Such groups are often organized along ideological
lines; for instance, these groups may organize around a shared
ideology opposed to the enforcement of federal immigration laws.
As such, the members of these groups often communicate with one
another to share information about their common ideology.  Such
sharing is usually conducted via text message, Internet
messaging application, and/or social media via digital devices.
Such digital devices are often kept in places where the members
of these groups have ready access to them such as on their
persons, in their vehicles, or in their homes.

22.  Such groups typically consist of a large number of
participants who are poised to coalesce into action on short
notice.  For example, should a group that is organized around a
shared ideology opposed to the enforcement of federal
immigration law learn of what the group believes to be an
immigration law enforcement operation, those members will
communicate with each other via digital devices to mobilize

large numbers of group members to hinder law enforcement action. Such digital devices are often kept in places where the members of these groups have ready access to them such as on their persons, in their vehicles, or in their homes.

23. In some instances, such groups have contacts who are privy to non-public law enforcement documents. By having access to such documents, the groups are able to anticipate law enforcement action and mobilize more quickly to hinder such action. Members of these groups often share such non-public information via digital devices. Such digital devices are often kept in places where the members of these groups have ready access to them such as on their persons, in their vehicles, or in their homes.

24. Members of these groups often keep the names, addresses, and telephone numbers of those involved in their activities on their digital devices. Such digital devices are often kept in places where the members of these groups have ready access to them such as on their persons, in their vehicles, or in their homes. Additionally, they often keep records of meetings with associates on their digital devices, including in the form of calendar entries and location data.

25. When members of these groups mobilize and confront law enforcement, they often engage in physical confrontations with law enforcement that can lead to assaults on federal officers. Following those incidents, members of these groups communicate via digital with one another and share their recollections of the event, to include sharing videos that capture officer

assaults.  Such digital devices are often kept in places where the members of these groups have ready access to them such as on their persons, in their vehicles, or in their homes.

## V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

26.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, among other things, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

27.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons,
including the following:

     a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

     b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

     28.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

     a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.  In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.  Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress ALFARO's thumb and/or fingers on the
device(s); and (2) hold the device(s) in front of ALFARO's face
with his or her eyes open to activate the facial-, iris-, and/or
retina-recognition feature.

   29.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VI. <u>CONCLUSION</u>

   30.  For all the reasons described above, there is probable
cause to believe that ALFARO violated 18 U.S.C. § 111: Assault
of a Federal Officer.

31.  Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the search of ALFARO's person as described further in Attachment A-1, the SUBJECT VEHICLE as described further in Attachment A-2, and the SUBJECT PREMISES as described in Attachment A-3.


                                        /s/
                              _____
                              Frank Pellegrini, Special
                              Agent FPS



Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  8TH   day of
September, 2025.

_____
HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

**Person TO BE SEARCHED**

The person to be searched is Johnathan Michael ALFARO, ("ALFARO"), born on November 23, 1989, a hispanic male that is 5'4" and weighs approximately 180 pounds.  The following DMV photograph with blue background depicts ALFARO from 2016. The photo on the right dipects ALFARO dated August 30, 2025 in front of the federal facility.  The search of ALFARO shall include any and all clothing and personal belongings, backpacks, wallets, briefcases, and bags that are within ALFARO's immediate vicinity and control at the location where the search warrant is executed.  The search shall not include a strip search or a body cavity search.

 

**ATTACHMENT A-2**

**VEHICLE TO BE SEARCHED**

    A 2024 Subaru Outback bearing California license plate 9MCP667 and a vehicle identification number 4S4BTAFC7R3238071 which is ALFAROS's registered vehicle.



**ATTACHMENT A-3**

**RESIDENCE TO BE SEARCHED**

The residence located at 1206 S Gladys Avenue, San Gabriel, California 91776. The search will include the detached garage, any and all structures at the rear of the property or attached to the garage, including, but not limited to, "Unit B" of the residence, and curtilage of the residence.



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.      The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 111: Assault on a Federal Officer and 18 U.S.C. § 372: Conspiracy to Obstruct or Injure a Federal Officer (the "Subject Offenses"), from June 6, 2025, to the present, namely:

        a.      A dual filter gas mask with two bright pink filters. The mask has a clear framed eye shield that is straight along the top edge, and the main body of the mask appears grey in color and a black leather jacket with built-in belt straps across the front, and silver zippers as depicted in the photo below:



      b.    Data, records, documents, or information (including electronic mail and messages) pertaining to the organization of efforts to impede law enforcement activity (to including by assaulting law enforcement officer), such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

      c.    Software or tools used to organize efforts to impede law enforcement activity; and

      d.    Software or tools used to organize efforts to impede law enforcement activity.

2.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

3.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

      a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

      b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.    records of or information about Internet Protocol addresses used by the device.

4.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters,

monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

6.    In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
one year from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this one-year period without obtaining
an extension of time order from the Court.

b.    The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.    The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine

whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        d.  If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.  If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling

within the scope of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

g.   The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

h.   After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

7.   The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

8.   During the execution of this search warrant, law
enforcement is permitted to: (1) depress ALFARO's thumb and/or

fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of ALFARO's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.